**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 22-20204** |
| **COASTAL DRILLING** | § | |
| **LAND COMPANY, L.L.C.,** | § | **Chapter 11** |
| | § | |
| Debtor.[1] | § | |

**DECLARATION OF J. CHRIS MCCLANAHAN IN SUPPORT OF
THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, J. Chris McClanahan, hereby submit this declaration (this "Declaration") under penalty of perjury:

1. I am the Chief Executive Officer and Managing Member of Coastal Drilling Land Company, L.L.C., the above-captioned debtor and debtor in possession (the "Debtor" or "Company"). I have served in this capacity with the Company since it was formed. In total, I have over twenty-five (25) years of experience managing oilfield service companies and their assets.

2. I am generally familiar with the Debtor's day-to-day operations, oil and gas assets, financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations, assets, finances, and employees; information learned from my review of relevant documents; information supplied to me by other members of Company's management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Company's operations, financial condition, and the oil and gas industry generally. I am over the age of 18

---

[1] The debtor and debtor in possession in this chapter 11 case, along with the last four digits of the Debtor's Employer Identification Number, is as follows: Coastal Drilling Land Company, L.L.C. (2680). The Debtor's service address is: 311 Saratoga Blvd., Corpus Christi, Texas 78417.

and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I could and would competently testify to the facts set forth herein.

3.      On August 28, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under chapter 11, title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Court"). To minimize the adverse effects on its business, the Debtor has filed motions seeking various types of "first day" relief (the "First Day Motions") to allow the Debtor to meet its obligations and fulfill its duties as a debtor in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each is necessary to enable the Debtor to operate in the Chapter 11 Case with minimal disruption or loss of productivity and value. I further believe that the relief sought in each First Day Motion constitutes a critical element in moving towards a sale of substantially all of the Debtor's assets, and best serves the Debtor's estate and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference.

4.      To familiarize the Court with the Debtor, its business, the circumstances leading to this Chapter 11 Case, and the relief the Debtor is seeking in the First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtor's business corporate history, current operations, and assets;

- **Part II** describes the Debtor's prepetition capital structure and indebtedness;[2]

- **Part III** describes the circumstances leading to the commencement of the Chapter 11 Case; and

---

[2] Many of the financial figures that will be presented in this Declaration are unaudited and potentially subject to change but reflect the Debtor's most recent review of its business. The Debtor reserves all rights to revise and supplement the figures presented herein.

- **Part IV** sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

## I.   COMPANY OVERVIEW

### A.   Company History and Hierarchy

5.     The Debtor in this Chapter 11 Case is Coastal Drilling Land Company, L.L.C., a limited liability company organized under the laws of the State of Texas.   The Debtor was formed in around 1998 as a drilling rig service provider.   The Debtor has two (2) Members, each owning fifty percent (50%) of the Company.   For ease of reference, a corporate organizational chart identifying the Members of the Debtor is set forth below.



### B.   Executive Offices and Facilities

6.     The Debtor maintains its corporate headquarters at 311 Saratoga Blvd., Corpus Christi, Texas 78417.   The Debtor's office is leased from a non-Debtor affiliate of the Company,

Third Coast Real Estate, L.L.C.  As of the Petition Date, the Debtor was timely on its monthly rent obligations.

7.      The Debtor's offices and facilities require utilities such as electricity, telecommunications, internet and related services (the "Utility Services") to support its oilfield service operations.  To the best of the Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.  On average, the Debtor pays approximately $7,275.00 each month for third-party Utility Services to their various utility service provides (the "Utility Providers").  To the best of the Debtor's knowledge, the Debtor does not have any existing prepayments or deposits with respect to any Utility Providers.

C.      **Current Assets and Operations**

8.      The Debtor focuses on providing oilfield services by deploying its land rigs to customer locations in the South Texas and Gulf Coast regions.  Among other things, the Debtor's asset portfolio consists of two (2) operational drilling rigs currently in use by customers, three (3) non-operating rigs, and various trucks, trailers, drill pipe, and other equipment used to support its business operations.

9.      Currently, the Debtor derives the totality of its revenue by deploying its rigs to drilling sites owned or operated by its customers who then utilize the Debtor's rigs and other services to drill for crude oil, natural gas, and natural gas liquids.  As a result, the Debtor's revenues, ultimate profitability, access to capital, and its growth as a company, are subject to the prevailing prices of these oil and gas commodities because of the direct impact they have on the Debtor's industry.

D.  **Employees and Payroll Obligations**

10.    The Debtor maintains a small staff to support its business and service the projects for its customers in Texas.  Specifically, the Debtor has approximately six (6) salaried employees and forty-five (45) hourly employees (collectively, the "Employees").  The types of Employees include directors and officers, administrative staff, operational staff, field personnel, and truck drivers.  Except for the field personnel who are deployed to various customer sites, each of the Employees work at the Debtor's office facilities in Corpus Christi, Texas.  The vast majority of the Employees rely exclusively on their compensation to pay their daily living expenses and support their families.  Thus, Employees would be exposed to significant financial hardship if the Debtor were not permitted to continue paying their compensation, reimburse their expenses incurred in support of the Debtor's operations, and otherwise maintain existing programs.

11.    Collectively, the Employees are paid approximately $449,000 per month.  Thus, because the Debtor's Petition Date fell between pay periods, the Debtor estimates that approximately $164,333.00 is owed to Employees for work prior to the Petition Date, and this amount represents only a portion of the total amount that will be owed through the end of the applicable pay periods for the hourly and salaried Employees.

12.    The Debtor utilizes the services of a professional employment organization, ADP, LLC ("ADP"), to process payroll, and the 401(k) plans[3] are administered through John Hancock. While the Debtor does not provide insurance benefits, the Debtor has established a platform for Employees to purchase life insurance and disability insurance through a third-party.

---

[3] The 401(k) contributions of Employees are withheld from their paychecks. The Debtor submits the Employee contributions directly to the third-party administrator, John Hancock.

4891-4783-1856, v. 1

13.     To pay the Employees, the Debtor submits a net amount of money to ADP prior to the conclusion of each pay period, who then administers all of the Debtor's obligations incurred or related to wages, salaries, payroll taxes, and payroll service fees.  Employees are paid bi-monthly via direct deposit from ADP.  The last pay period for the hourly Employees ended on August 21, 2022, and the hourly Employees were paid by the Debtor on August 25, 2022 for that prepetition pay period.  The last pay period for the salaried Employees ends on August 31, 2022, and the salaried Employees are due to be paid on September 1, 2022.

## II.     PREPETITION DEBT

### A.     Secured Debt

14.     The Debtor has incurred a substantial amount of debt in order to fund its activities and sustain operations.  The Debtor's prepetition secured obligations to First Horizon Bank, as successor by conversion to First Tennessee Bank National Association ("First Horizon"), matured on June 30, 2022, in accordance with the terms of that certain Loan Agreement dated August 19, 2015 (as amended, modified, and supplemented from time to time, the "Loan Agreement"), and that certain Security Agreement dated August 19, 2015 (the "Security Agreement," and collectively with the Loan Agreement, the "First Horizon Loan Documents") by and between the Debtor and First Horizon.  Pursuant to the Security Agreement, First Horizon made certain loans, advances, and other financial accommodations to the Debtor to fund the Debtor's operations and maintains a first lien on all assets of the Debtor (the "Cash Collateral").  The advances from First Horizon were represented by a Term Note in the original principal amount of $5.75 million (the "First Horizon Term Note") and a Revolving Credit Note in the original principal amount of $2 million (the "First Horizon Revolving Credit Note").  On July 22, 2022, the Debtor received a Notice of Default from First Horizon providing that the outstanding

6

amount of $2,432,959.33 was due and owing by the Debtor to First Horizon on the First Horizon Term Note and in accordance with the First Horizon Loan Documents.

15.     In addition to the secured debt owed to First Horizon, the Debtor has other prepetition secured obligations owed to John Powers ("Powers"), an insider of the Debtor, with respect to certain of the Debtor's trucks on which Powers holds liens.[4]   Specifically, the outstanding balance on the note due to Powers is approximately $1,329,322.00.

16.     Powers further alleges that he is the subrogee of First Horizon with respect to the First Horizon Revolving Credit Note. Specifically, Power submits that (i) pursuant to the First Horizon Loan Documents, the aggregate amount of not less than $2 million is due and owing by the Debtor to him as subrogee of First Horizon on the First Horizon Revolving Credit Note as of the Petition Date; (ii) the First Horizon Revolving Credit Note constitutes the Debtor's legal, valid and binding obligation, enforceable in accordance with the terms of the First Horizon Loan Documents; and (iii) the First Horizon Revolving Credit Note is secured by valid, binding, perfected and enforceable liens and security interests granted by the Debtor to and for the benefit of First Horizon, and now to Powers as subrogee, pursuant to the First Horizon Loan Documents and further set forth in the recorded UCC Financing Statement of First Horizon.

17.     Finally, another creditor of the Debtor, Drilling Tools International, Inc. ("DTI"), obtained an agreed judgment against the Debtor on or about March 22, 2022 in connection with certain prepetition litigation.  DTI has also filed a UCC financing statement to perfect a lien on or about July 16, 2020.  DTI alleges that the outstanding balance owed as of the Petition Date was approximately, $60,074.37.

---

[4] The Debtor does not believe Powers holds a lien on the Debtor's cash.  Even to the extent Powers holds a lien on the proceeds of his collateral, the trucks do not directly generate revenue.

4891-4783-1856, v. 1

**B.**     <u>**Trade Debt and Other Unsecured Obligations**</u>

18.     In addition to the prepetition indebtedness owed to the secured creditors, the Debtor has substantial unsecured debt owed to various trade creditors, among others.  In the ordinary course, the Debtor has engaged in numerous strategic relationships with service providers in relation to its oil and gas operations which are critical to maintaining productivity. Due to the various liquidity issues described herein, the Debtor has not had sufficient cash flow to pay the trade payables.  In total, the Debtor had more than $9 million in outstanding trade payables as of the Petition Date related to these past obligations, many of which are the subject of current litigation or have already been reduced to judgments.

19.     Further, the Debtor has various obligations related to insider loans and extensions of unsecured credit, including from its non-Debtor affiliate, Coastal Drilling Company, L.L.C. The Debtor estimates that the outstanding amounts owed as of the Petition Date in connection with these unsecured notes and obligations is approximately $17 million.

### III.     <u>EVENTS LEADING TO BANKRUPTCY</u>

20.     The prolonged downturn and historic crash in commodity prices resulting from the COVID-19 pandemic left the Debtor unable to generate sufficient cash from operations to satisfy its obligations as they become due, including the prepetition secured indebtedness to First Horizon.  These factors, along with ongoing supply chain issues causing significant delays in receiving necessary parts and equipment, have significantly harmed the Debtor's financial position and its ability to effectively service its clients' needs.  The Debtor has been unable to dig itself out of this hole created by the global pandemic, and as a result, it has continued to incur losses from operations during the past several fiscal years.

4891-4783-1856, v. 1

21.     However, with the recent rebound of commodity prices, the Debtor's outlook has improved.  The Debtor has been able to resume business activities with its two (2) operational drilling rigs, and it currently generates a cash flow sufficient to cover its costs and service the prepetition secured debt.  The Debtor filed this Chapter 11 Case to reorganize its financial affairs and avail itself of the protections afforded by the automatic stay under section 362 of the Bankruptcy Code while it endeavors to preserve its business and maximize value for all stakeholders.   The Debtor has determined that a sale of substantially all of its assets consummated through a process under section 363 of the Bankruptcy Code would likely provide the greatest return for all creditors and therefore intends to pursue a such a sale in this Chapter 11 Case.

22.     After making the decision to file the Chapter 11 Case, the Debtor engaged Energy Capital Solutions, LLC ("ECS") as an investment banker on or about August 23, 2022 to market the assets.  The Debtor intends to file an application to employ ECS, on an expedited basis, in the Chapter 11 Case to promptly begin the marketing process in connection with the sale.

## IV.     FIRST DAY MOTIONS

23.     Below is an overview of the First Day Motions. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtor into the Chapter 11 Case and minimize disruptions to the Debtor's business operations.   Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

4891-4783-1856, v. 1

**A.**     **Debtor's Emergency Motion For Entry of an Order Extending The Time To File (I) Schedule of Assets and Liabilities, (II) Schedule of Current Income and Expenditures, (III) Schedule of Executory Contracts and Unexpired Leases, and (IV) Statement of Financial Affairs ("Schedules Motion")**

24.     In the Schedules Motion, the Debtor seeks entry of an order: (i) extending the deadline by which the Debtor must file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by fourteen (14) days, for a total of twenty-eight (28) days from the Petition Date, through and including September 25, 2022.

25.     The Debtor has spent, and continues to spend, a substantial amount of time ensuring a smooth transition into chapter 11, with minimal disruptions to the Debtor's business. To prepare the Schedules and Statements, I understand that the Debtor must compile information from books, records, and documents maintained by the Debtor relating to the claims, assets and prepetition contracts. Given the scope of the Debtor's operations, it will take substantial time to gather and process such information.  These tasks also include working with the Debtor's vendors and various other parties in interests to stabilize business operations, collect prepetition invoices, and review relevant materials.  The Debtor anticipates this process will exceed the fourteen (14) days provided by the Bankruptcy Code and Bankruptcy Rules. Moreover, the Debtor is currently operating with the minimum number of employees necessary to preserve the value of its estate, and only a few of those employees have detailed knowledge of the Debtor's financial affairs. In light of the significant amount of work required to complete the Schedules and Statements, as well as the competing demands on the Debtor's employees and professionals

to assist in critical efforts to stabilize the Debtor's business at this critical juncture in the Chapter 11 Case, I believe an extension is necessary.

26.     Further, I believe the requested extension will also aid the Debtor in efficiently preparing accurate Schedules and Statements, as it will allow the Debtor to account for prepetition invoices not yet received or entered into its accounting system as of the Petition Date, and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary.  As such, I believe the extension will benefit not only the Debtor, but all creditors and other parties in interest. Although the Debtor, with the assistance of its professional advisors, has started compiling the information necessary for the Schedules and Statements, the Debtor has been consumed with a multitude of other legal, business, and administrative matters in the weeks prior to the Petition Date.  Nevertheless, recognizing the importance of the Schedules and Statements in the Chapter 11 Case, the Debtor intends to complete the Schedules and Statements as quickly as possible under the circumstances.

27.     In view of the amount of information that must be assembled and compiled, and the limited time available to do so, I believe that ample cause exists for the requested extension.

**B.     Debtor's Emergency Motion for Entry of an Order (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>")**

28.     Pursuant to the Utilities Motion, the Debtor seeks entry of an order: (i) approving the Debtor's proposed adequate assurance of payment for future utility services; (ii) prohibiting utility companies from altering, refusing, or discontinuing services; and (iii) establishing procedures for determining adequate assurance of payment and resolving adequate assurance requests.

29.     In connection the operation of its business and management of its assets, the Debtor obtains Utility Services from a number of Utility Providers.  A nonexclusive list of the Utility Providers that provide Utility Services to the Debtor as of the Petition Date (the "Utilities Service List") is attached as Exhibit A to the Utilities Motion.

30.     To the best of the Debtor's knowledge, there are no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.  On average, the Debtor pays approximately $7,275.00 each month for such third-party Utility Services.  The Debtor does not have any existing prepayments or deposits with respect to any Utility Providers.

31.     The uninterrupted continuation of the Utility Services is critical to the Debtor's ongoing business operations throughout the course of this Chapter 11 Case.  Should any of the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be disrupted, negatively impacting the value of the Debtor's assets and potentially jeopardizing a sale during the Chapter 11 Case.  Accordingly, I believe the Utilities Motion should be approved by the Court.

**C.      Debtor's Emergency Motion for Entry of an Order Authorizing Continued Use of Prepetition Cash Management System, Bank Accounts, Business Forms, and Books and Records (the "Cash Management Motion")**

32.     Pursuant to the Cash Management Motion, the Debtor seeks entry of an order authorizing the Debtor to: (a) continue to operate its cash management system and maintain existing bank accounts, including honoring certain prepetition obligations related thereto; (b) maintain existing business forms; (c) continue the performance of its business transactions consistent with the Debtor's historical practices; and (d) waiving the guidelines (the "Guidelines") established by the United States Trustee for the Southern District of Texas (the "U.S. Trustee") related to cash management systems.

12

33.     In the ordinary course of business, the Debtor maintains a cash management system (the "Cash Management System") to gather, allocate, transfer, and disburse funds with respect to their operations and to facilitate cash monitoring and reporting.    The Cash Management System is comprised of active bank accounts (the "Accounts") with Kleberg Bank ("Kleberg") in Corpus Christi, Texas.  As currently established, the Debtor's existing Accounts and Cash Management System function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtor and all parties in interest.

34.     The Debtor also uses and maintain certain pre-printed checks, correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms related to its oil and gas operations and assets (collectively, the "Business Forms").   Adopting a new set of Business Forms would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay.  To minimize the administrative interruptions and expenses, the Debtor requests authority to continue to use the Business Forms substantially in the form existing immediately prior to the Petition Date, without reference to the Debtor's status as a "Debtor in Possession" in this Chapter 11 Case as required by the U.S. Trustee Guidelines.  However, if the Debtor exhausts its supply of checks during the Chapter 11 Case, the Debtor will print or order checks with the designation "Debtor in Possession" and the bankruptcy case number of this Chapter 11 Case.

35.     Given the nature of the Debtor's businesses, the uninterrupted use of the Debtor's Accounts is also vital to its operations and overall Cash Management System and will facilitate the Debtor's transition into the Chapter 11 Case by minimizing delays in paying post-petition debts and eliminating administrative inefficiencies.  Moreover, maintaining the current Cash Management System will allow the Debtor's limited workforce to attend their daily

13

responsibilities rather than organize and administer a new system.  Requiring the Debtor to adopt a new cash management system in the Chapter 11 Case would be costly, burdensome, and disruptive to operations at this critical juncture, and could have a negative effect on the Debtor's marketing and sale efforts.

36.    Finally, the Debtor seeks a waiver of the Guidelines established by the U.S. Trustee requiring that chapter 11 debtors in possession, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll; and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information.

37.    I believe that compliance with these requirements would create substantial and unnecessary administrative burdens, including additional expense, confusion among employees and creditors, and diversion of scarce time and personnel to the detriment of the Debtor as it transitions into this Chapter 11 Case. On the other hand, permitting the Debtor to maintain the existing Cash Management System and Accounts at Kleberg will prevent the disruption of operations and will not prejudice any party in interest. Further, because the Debtor presently maintains sophisticated, computerized accounting and record keeping systems related to the Accounts and operations, the Debtor will be able to ensure that all prepetition and post-petition transactions are properly accounted for and easily distinguished.  The Debtor intends to continue maintain complete and accurate records of all transfers of funds in and out of the Accounts.  I therefore believe a waiver of the U.S. Trustee Guidelines is appropriate, as set forth in the Cash Management Motion.

14

**D.      Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Wages to Employees and (II) Granting Related Relief (the "Employee Wage Motion")**

38.      In the Employee Wage Motion, the Debtor requests entry of an order: (i) authorizing, but not directing, the Debtor to (a) pay, in its sole discretion, all obligations incurred under or related to wages, salaries, other compensation, reimbursable expenses, and payroll service fees (collectively, the "Employee Obligations") and all costs related to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies in place for the Employees, as such may be modified, amended, or supplemented from time to time in the ordinary course of business; and (ii) authorizing and directing the Debtor's Banks, including Kleberg, to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Employee Obligations.

39.      As set forth above and in the Employee Wage Motion, the Debtor is currently operating with a small, close-knit staff of salaried and hourly Employees.  These Employees are vital to maintaining the value of the Debtor's estate as it transitions into the Chapter 11 Case and endeavors to complete a sale of substantially all of assets.  The Debtor utilize the services of a professional employment organization, ADP, to process payroll and administer employee benefit plans.  The Debtor submits a net amount of money to ADP for the conclusion of each pay period, and ADP then administers the Employee Obligations.  Employees are paid every other week via direct deposit from ADP, which funds are pre-paid to ADP using funds drawn from the Debtor's operating account at Kleberg.  The Debtor's description of the payroll process and the amounts and other Employee Obligations due to the Employees as set forth in the Employee Wage Motion and Exhibit A thereto is accurate.

4891-4783-1856, v. 1

40.     I believe that the relief requested in the Employee Wage Motion is in the best interest of the Debtor's estate and will enable the Debtor to continue to operate its business in the Chapter 11 Case disruption so as to avoid immediate and irreparable harm to the Debtor's estate. Accordingly, I believe the Court should grant the relief requested in the Employee Wage Motion and authorize the Debtor to honor the Employee Obligations, including those incurred prior to the Petition Date, and pay its Employees during the Chapter 11 Case.

**E.    Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain Critical Vendors, and (II) Authorizing Banks to Honor All Related Checks and Electronic Payment Requests (the "<u>Critical Vendor Motion</u>")**

41.     The Critical Vendor Motion is among the most important First Day Motions seeking relief necessary to protect and preserve value of the Debtor's estate in this Chapter 11 Case.  In the Critical Vendor Motion, the Debtor seeks the entry of an order (i) authorizing the Debtor, in its discretion, to pay all or part of prepetition claims (the "<u>Critical Vendor Claims</u>") of certain vendors (the "<u>Critical Vendors</u>") which are necessary to success of the Debtor's current operations and this Chapter 11 Case. Specifically, the Debtor seeks to pay Critical Vendors that are currently providing goods and services with respect to the Debtor's ongoing hobs where rigs are operating on location for customers, and such Critical Vendors have also provided: (a) essential goods to, or on behalf of, the Debtor that were received by the Debtor before the Petition Date; or (b) essential services that were rendered to, or on behalf of, the Debtor before the Petition Date.  The Debtor intends to apply its sound business judgment and discretion on a case-by-case basis and pay only those Critical Vendor Claims that are: (i) vital to maintaining its operations; and (ii) are willing to provide the Debtor with favorable post-petition terms in accordance with any order granting the relief requested in the Critical Vendor Motion.

16

42.     The Debtor also requests authorization for the Debtor's banks, including Kleberg, to honor, process and pay (to the extent funds are available in the accounts) any pre-petition checks or wire transfer requests issued by the Debtor on account of the Critical Vendor Claims. The Debtor further seeks authority to issue new post-petition checks, or effect new electronic fund transfers, to replace any pre-petition checks or electronic fund transfer requests that may be dishonored or rejected as a result of the filing of this Chapter 11 Case.

43.     As explained above and in the Critical Vendor Motion, the Debtor's primary concern at this critical juncture of the Chapter 11 Case is to protect and preserve the value of its estate by ensuring that its ongoing operations continue uninterrupted.  Given the nature of the Debtor's oil and gas service business, if a Critical Vendor goes unpaid on account of its prepetition Critical Vendor Claim, they may assert liens against the wells of the Debtor's customers.  In turn, the Debtor's customers could refuse any further payments to the Debtor, and the Debtor's ability to operate in this Chapter 11 Case would be placed in jeopardy.  Thus, I believe the best way to ensure the value of the Debtor's estate is preserved during this Chapter 11 Case is to pay the Critical Vendors on account of their Critical Vendor Claims and avoid the unnecessary problems that would arise from a lien dispute with vendors and customers.

44.     I further believe that the payment of the Critical Vendor Claims is vital to the Debtor's efforts to reorganize its financial affairs in this Chapter 11 Case.  In many cases, the Critical Vendors are the only source, or the most preferred source, from which the Debtor can procure certain goods and services within a timeframe and at a price that will permit the Debtor to continue to smoothly operate its business.  A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtor

post-petition and may force the Debtor to obtain such goods and services elsewhere at a much higher price or in a quantity or quality that is insufficient to satisfy the Debtor's requirements.

45.     In other cases, the Debtor has an established relationship with a vendor, and the time and expense of getting another vendor "up to speed" with the Debtor's ongoing projects is not cost effective.  Indeed, the Debtor is highly dependent on its ability to order and receive supplies or services from vendors in a particular timeframe, including on an emergency or expedited basis, as needed at the Debtor's jobsites.

46.     In sum, I believe the relief requested in the Critical Vendor Motion is in the best interests of the Debtor, its estate, and all creditors in this Chapter 11 Case.  The Debtor understands that payment of Critical Vendor Claims will remain subject to the terms and conditions contained in any orders entered by this Court authorizing the use of cash collateral, the borrowing of money pursuant to a DIP loan, and any accompanying approved budgets related to the same.  If the Court grants the relief requested in the Critical Vendor Motion, the Debtor will maintain detailed records of all payments of Critical Vendor Claims, as well as any agreements with Critical Vendors detailing their acknowledgement of the Court's order and agreement to provide Customary Trade Terms to the Debtor during the Chapter 11 Case.

**F.     Debtor's Emergency Motion for Entry of an Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (II) Granting Adequate Protection for the Use Thereof; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral; and (IV) Granting Related Relief (the "Cash Collateral Motion")**

47.     The Cash Collateral Motion is critical to the Debtor's success in this Chapter 11 Case, and without the Court granting the relief requested in the Cash Collateral Motion, each of the foregoing First Day Motions would be rendered moot. Pursuant to the Cash Collateral Motion, the Debtor seeks entry of interim and final orders approving the Debtor's use of Cash

18

Collateral as working capital in the operation of its business for the purposes specified in, and at least for the interim period defined in, the budget (the "Budget") which is attached as Exhibit A to the Cash Collateral Motion.  Specifically, the Debtor requests that the Court enter an order on an interim basis (the "Interim Order") authorizing use of Cash Collateral in accordance with the Budget, providing adequate protection for, and to the extent of, any diminution in value of the Cash Collateral, and scheduling a final hearing (the "Final Hearing") for the Court to consider entry of a final order (the "Final Order") authorizing and approving the relief requested in the Cash Collateral Motion.

48.     The use of Cash Collateral will ensure that the Debtor has access to sufficient liquidity to maintain ordinary course operations and meet its financial commitments throughout this Chapter 11 Case.  The Debtor requires use of Cash Collateral to make payments to, *inter alia*, the Debtor's vendors, customers, Employees and Utility Providers (as defined above), for purposes of sustaining its ongoing operations and paying related expenses.  Any failure to make those payments could cause substantial uncertainty and disruption to the Debtor's business.

49.     Based on the financial forecasts and analysis conducted by Debtor's management team prior to the Petition Date, and absent authority to use Cash Collateral, the Debtor would be unable to generate enough cash from operations in the ordinary course of business to cover its working capital needs in addition to the projected costs of this Chapter 11 Case.  The Debtor's general analysis is contained in the pro forma financial statement which has been filed as an exhibit [ECF # 16-8] in the Chapter 11 Case.  This financial statement was prepared by the Debtor prior to the Petition Date, and has not been updated to match the Budget attached to Cash Collateral Motion.  This financial statement was presented for demonstrative purposes only, and is intended to give the Court and parties in interest an overview of the Debtor's balance sheet, as

well as what the Debtor's future performance could look like as it endeavors to market and sell its assets during this Chapter 11 Case. As the Debtor prepares its Schedules and Statements to be filed in the Chapter 11 Case, the Debtor expects that the financial information will vary from the information set forth in the pro forma prepared in the weeks prior to the Petition Date.

50.     In sum, the Debtor will have insufficient cash to operate absent the Court's authority to use Cash Collateral.  As set forth in the Cash Collateral Motion, the Debtor needs authority to use Cash Collateral, at least for the interim period, while the Debtor negotiates, finalizes, and seeks Court approval of a second lien debtor in possession loan (the "DIP Loan"), which will be subordinate only to First's Horizon's liens.[5]

51.     I believe that the use of Cash Collateral with the Secured Lenders' consent will also send a positive, credible message to the Debtor's workforce and commercial counterparties that the Debtor will be able to meet its ordinary course obligations and operate in the Chapter 11 Case as it progresses toward a successful sale of substantially all of its assets. I further believe the Debtor will face substantial and irreparable harm without the relief requested in the Cash Collateral Motion.  Accordingly, I believe the Court should grant the relief requested in the Cash Collateral Motion and enter the Interim Order, and after the conclusion of the Final Hearing, the Final Order, authorizing the Debtor to use Cash Collateral in accordance with the Budget.

Signed on the 29th day of August, 2022.

**COASTAL DRILLING LAND COMPANY, L.L.C.**

By: _____ /s/ *J. Chris McClanahan* _____
        J. Chris McClanahan
        Chief Executive Officer

---

[5] The Debtor and its advisors are in the process of negotiating the terms of such DIP Loan with Powers to sustain the Debtor's operations for the duration of the Chapter 11 Case.  The Debtor will file a motion to approve the DIP Loan as soon as reasonably practicable and provide all parties with ample notice of the proposed terms.